UNITED STATES (WESTON v.). See Case No. 17,457.

## Case No. 16,669.

UNITED STATES v. WHALAN et al.

[7 Int. Rev. Rec. 161; 1 Am. Law T. Rep. U. S. Cts. 63.]

District Court, D. Massachusetts. 1868.

CONSPIRACY TO DEFRAUD THE UNITED STATES.

[In the act of March 2, 1867 [14 Stat. 471], which defines the misdemeanor of conspiring to defraud the United States, the word "conspiracy" is used in a somewhat more comprehensive meaning than that which it has at common law, and it is immaterial whether the fraud contemplated has been declared a crime by statute or not.]

This was an indictment founded upon the thirtieth section of the act of March 2, 1867, by which two or more parties conspiring together to defraud the government are deemed guilty of a misdemeanor, and, on conviction, are held liable to a penalty of not less than one thousand nor more than ten thousand dollars, and to imprisonment not exceeding two years. A joint indictment was found against James Whalan, William A. Wright, Joseph Boyden, Edward H. Maxwell, W. Howard Hathaway, N. Porter Cleaves, John E. Cassidy, and Robert L. Davis, who were charged with conspiring together to defraud the government of taxes upon spirits stored in the bonded warehouse of W. H. Hathaway and N. Porter Cleaves. The spirits were taken out upon fraudulent bonds, either for rectification or transportation, for exportation to Eastport, Me. A vessel was bought, a cellar hired, and water was substituted for the spirits and put on board of the vessel, which was afterwards seized. The government discontinued as to four of the defendants,—Maxwell, Hathaway, Cassidy, and Davis,—who were discharged. Wright pleaded nolo contendere, and appeared upon the stand as a witness, confessing the whole scheme, and the case proceeded only against two,—Boyden and Cleaves. [See Case No. 14,632.]

G. S. Hillard, H. D. Hyde, and G. M. Reed, for the Government.

H. W. Paine and R. M. Moore, Jr., for Boyden.

L. S. Dubney, for Cleaves.

LOWELL, District Judge (charging jury). The statute under which this indictment is framed was passed March 2, 1867, and in the 30th section of the 169th chapter of the acts for that year. The act relates to various matters connected with the internal revenue department, and the various taxes to be assessed. There is, among others, this general provision of law, which has a wide application, and covers all frauds which human ingenuity can devise. "If two or more persons conspire either to commit any offence against the laws of the United States, or to defraud the United States in any manner whatever, and one or more of said parties to said conspiracy shall do any act to effect the object thereof, the parties * * * shall be deemed

guilty of a misdemeanor," etc. Conspiracy is an agreement by two or more persons to commit an unlawful act or acts. It is sometimes defined to be an agreement to commit an act in itself unlawful, or to do an act lawful in itself by unlawful means. Either the final result or the means are to be unlawful. There is no special force in this division, inasmuch as something unlawful is to be done. This is the common-law definition independent of statute, and if the statute spoke simply of a conspiracy, it ought perhaps to be construed with reference to the common-law definition. But in this statute the word has a more comprehensive meaning, because it includes defrauding the United States in any manner whatever, whether the fraud had been declared a crime by any statute or not. It is therefore immaterial to consider whether the acts were a crime independent of the statute, if there is shown a conspiracy to defraud the government.

The indictment sets forth that the United States had under its control in the Third district, in two bonded warehouses, those of Cleaves and Hathaway, certain distilled spirits, distilled in the United States, the property of certain persons to the jury unknown; that the persons mentioned in the indictment, of which the defendants are two, conspired to defraud the United States of a tax which would be due upon being taken out for consumption. The law for the regulation of the department shows that owners of spirits were allowed to keep them in a warehouse approved by the government under the charge of two persons, one a proprietor, and the other a storekeeper, who has a separate lock and key. It is the duty of the latter to see to it, that the goods were not delivered out except upon special permits. Those permits might be granted under certain circumstances, as might be convenient for the owners. If the owners of the spirits required them to be purified by rectification, they might take them out temporarily, giving a bond with sureties for their return within a specified time, less three per cent. as an average loss in going through the process. (2) The spirits might be taken out for sale, and then the tax was paid. (3) Or for transportation to another warehouse in any district in the United States. A bond in this latter case is given that the spirits will be transported to the district and warehoused, and a certificate is to be sent that they have been so warehoused. (4) Or they may be taken out for exportation, when the tax need not be paid, as they are allowed to be exported free from duty; the government in this case presuming that it will get an equivalent in the increase of commerce. In this fourth case the method is somewhat complicated. Bonded warehouses exist all over the country, in inland as well as seaport towns. That the goods may be exported they must be at a port. It is contemplated in the law that the goods may be taken to a seaport town for exportation.

This complicated system of warehousing gives the opportunity for fraud by persons disposed to avail themselves of it; and it is said by the government that it was availed of in this case. The indictment sets forth the manner in which the government charge that the person undertook to commit the fraud. No argument has been addressed to the court in relation to the indictment. The act charged is stated in various ways, to be adapted to the various phases of the case which might be developed by the evidence. In some of the counts the charge is stated very generally. In others the particular practices to be put into execution are set forth,—in one by changing the marks; in another by giving worthless bonds; in one or more by a fraudulent pretence that the goods were intended for exportation; in all, some act or acts are alleged to have been done to carry out the conspiracy. It is not necessary that the jury should discriminate between them. If any count is good, it will support a general verdict. It is not denied that some of the persons charged were guilty of a corrupt agreement to obtain the goods, with the intent to defraud the government by some of the means alleged. It is not denied that some of those who were first charged were not guilty. The question for the jury is whether either or both of the defendants have been proved beyond all reasonable doubt to be partakers in this agreement to defraud the government.

One of the witnesses produced for the government stands before you in a peculiar position. He comes here stating that he was one of the parties to the fraud, one of the chief actors. He undertakes to tell the jury how the fraud was conceived, and how it was to be carried out. It is a rule of practice for judges in the exercise of their duty to say to juries that a person who declares himself on the stand to be guilty of the crime charged stands in such a relation to the case as to render it unsafe to convict upon his testimony alone, unless confirmed upon material points by evidence to which no suspicion attaches. This is no doubt a wise and proper rule of practice. It is sometimes necessary to call such witnesses, but they stand before a jury under a strong bias and confessing their own infamy. It is a rule of practice as old as the other one that a person who thus testifies will not be punished unless he tells an entirely different story on the stand from what he has told out of court. When a number of parties have been arrested, there is always a strong temptation to throw the blame on each other, and to buy immunity by evidence; and the stronger the suspicions are against one, the greater is the temptation, because he has less chance of escape in any other way. So that the juries look for corroboration from independent witnesses who testify to material facts in the case; and these facts must tend not only to show his own knowledge of the crime, which he admits, but the complicity of the others.

The evidence has been before the jury. The whole subject has been gone into with great detail. The government say that they have produced independent testimony of acts which show the truth of the story given by Wright, and to give him a credit which his own circumstances would not justify. His story is that this scheme was first started in New York, in a conversation between him and Boyden. It was first proposed to carry out the plan in Brooklyn, but this was abandoned as impracticable. He came back to Boston in March. It was then agreed that the scheme be carried out in Boston, and he was asked to look about for a vessel. He went to Salem and bought a vessel, agreeing to pay $200 down and the rest in a short time. The price was $3,000. He received all the money from Boyden. Boyden and he agreed that they had better hire a cellar, to which the spirits should be taken, and from which they should be taken out for sale. The schooner was to be loaded with barrels containing water. Wright having refused to be principal in the bonds, Boyden asked him to procure persons to be principals, and sureties who should be worthless. He procured men by the names of Whalan and Eaton to appear as principals. He went to Thatcher & Co., and bought some alcohol of one Bray, in Whalan's name, and paid for it with a check given by Boyden. Goods were obtained in other ways, Boyden furnishing the money, and agreeing to give him one-fourth of the profits. This is Wright's story.

The government say that it is corroborated by other facts proved by the witnesses. There is evidence tending to show that Boyden owned and dealt with a considerable part of the liquor. He sold 100 barrels of them to Mr. Graves; he had 195 more carted to his own warehouse; still others were found with marks which are said to show that they were part of the spirits taken out of bond. Mr. Mead's evidence tends to show that he carted 96 or 97 barrels of something which the government say was water, and which they say belonged to Boyden, from Cleaves' warehouse to the vessel or cellar; 105 barrels from Cassidy's to the same place; that on the 18th of April, he carted 100 barrels from Hathaway's, which were on the next day carried to Mr. Graves; that on the 23d he carted 195 barrels from Hathaway's to Russia wharf, and on the 24th, 195 barrels to Boyden's. The government contend that the 97 barrels from Cleaves' were filled with water, and also the 195 from Hathaway's. On the 19th of April, the witness Holt saw barrels which the government say contained water carried to the vessel from Cassidy's. They have not traced all the barrels taken out. So far as the 97 barrels are concerned, there was evidence that they were taken directly to the wharf, and were seen to be put on board the vessel. They say they have traced the barrels from that time till they were taken from the vessel and emptied. They ask the jury to conclude that they must have been filled with water.

Against this is the testimony of the defendant's witnesses. Mr. Graves, the deputy storekeeper says, that he allowed them to go out for cooperage. It is said by Gen. McCartney that Graves at the time denied all knowledge of them. He now, however, says that he allowed them to go out for cooperage, and that Mr. Cleaves ordered him to do so. He says that they came back as they went out, that he tasted as many as three of them, and found spirits in them. There is some opportunity that persons giving such evidence may be mistaken. One lot may be confounded with another. It is for the jury to say whether the goods were the same that afterwards came back. These 97 barrels play an important part in this case. They were the property of Boyden & Co., and on the 15th of April, Boyden was at Cleaves' warehouse having some business in relation to them, and taking them out for cooperage; on the 13th, Cleaves had given orders that they should be brought down from up stairs. On the 9th of April, Wright hired the cellar at Russia wharf. On the 10th, Rennick thought water was being freely used in the cellar. On the 17th Whalen applied for a license as a rectifier. Now, the argument of the government is, that it is proved beyond a reasonable doubt, that the 97 barrels when taken out to be coopered, were not returned as taken out, and that other barrels were substituted with similar brands, and that it must be inferred that it was done by Boyden, or caused to be done by him. They further argue that it is a circumstance connecting Cleaves with the scheme, as he would not be likely to induce a storekeeper to do an illegal act except for some reasons of his own.

The next point in which the government say that there is a corroboration, is upon the ownership by Boyden, that all the liquors traced were his, except the 54 barrels found at Maxwell's. The next fact relied upon is that Boyden had some connection with getting goods out of the warehouse. He certified on the back of one of the bonds that the principals and sureties appeared before him, and on another that the principals appeared and made oath to their sufficiency, and they argue that he must have known that the certificate was false. They say that a letter in his handwriting has a tendency to show the same thing. The letter requests Wright to bring the parties to him to be sworn, and says, that he (Boyden) had made certain arrangements about the bonds, and they argue that this letter shows that Boyden took an interest in it. He is to see Sanderson and make arrangements

about making a general bond, that this shows a connection not altogether innocent. They produce also a paper in his handwriting containing a list of the different lots taken out of the warehouse, with the proper marks and the number correct in every respect as they say. They see no reason why such a list should be made out except because he was principal in the transaction. These are the principal facts in the case for the government. There is, however, the additional fact that the schooner was reported at Boyden's office. But Wright's office was in the same building. Then Boyden went down to Russia wharf in a carriage and went to see Wright after his arrest at an unusual hour. Besides these facts, there is another fact alluded to in the argument for the government, that the handwriting of the body of some of the bonds, and that in a paper in the handwriting of Boyden will be found to be the same. Upon this last point you ought to be very careful, because it was not alluded to until the final agreement, and there has been no opportunity to meet it.

In the case of Cleaves, there is no evidence of Wright's to connect him with the transaction. The evidence tends to show that certain goods were taken out for rectification, and never returned. Cleaves certified that they were afterwards inspected at his warehouse. The government say that they were not there, and were never inspected. They argue that these facts show that he was connected with the scheme. The other principal fact against Cleaves besides the matter of the 97 barrels already referred to, is, that being the owner of certain spirits they got out of the warehouse, the permit being in the name of Joseph E. Eaton. I do not understand it to be a part of the duty of an inspector to certify that the goods are in the warehouse. The fact that Cleaves was a warehouse keeper has nothing to do with it. The government officers had no right to rely upon the statements of Cleaves that the goods were there. They should have had the certificate of the storekeeper. But, at the same time, if the jury are satisfied that Cleaves said they were at his warehouse, it is a circumstance to be considered by them.

On the part of the defence it is said, that Boyden had been intimate with Wright for many years, and had been in the habit of leaving him money; that the nature of their connection was such, that Wright would have every opportunity to deceive Boyden while deceiving others; that if Wright should come to Boyden and ask for even so large a sum as $3,000, it would not excite his suspicion. It would be natural and expected, they say, that Boyden would be apparently engaged in any business in which Wright was engaged. If the connection of Boyden was only as a buyer, or seller, or a lender, he must be acquitted. Harrington says that he bought some of the goods of Mr. Andrews, and sold them again to Mr. Graves. Goods were sold to Whalan and paid for by him. The defendants say further that any justice of the peace is liable to be imposed upon, especially by his friends, who say that persons sworn upon bonds before him are sufficient; that by that view the letter is more naturally explained than by the other; and that the other paper said to be in the handwriting of Boyden, was left by the evidence in so unsatisfactory a state, that Boyden had no opportunity to meet it. So they say that the facts are consistent with the theory, that Boyden was only trying to make a good bargain, and that although the goods were sold cheap, all the facts are consistent with his innocence. The question is for the jury to decide. It devolves upon the government to prove the charge beyond a reasonable doubt.

On the part of Cleaves the explanation is this: "True, I did not inspect the liquors; did not warehouse them; but for certain purposes of convenience I had months before allowed Davis to use my stencil plate, he making returns to me as agent. It was not contended that the act was, strictly speaking, illegal. They were inspected by Davis, who certified the fact to me. The goods existed at Russia wharf; Davis certified to me that they were inspected; I certified that they were in my warehouse, as I have done before. I do not think it makes any difference whether this mode of warehousing constructing was done in the case of spirits or oils, as the same regulations apply to both." This explanation involves the assumption that Cleaves knew that the goods were to be transported somewhere. So far as he was able, he authorized the fraud to be committed, but says that he did not do it knowingly. No harm would be done, he thought, to the government. The explanation is substantially the same as to the 97 barrels, and all the others except 18, which he took for debt, and says that he sold as soon as he had a chance. As to the 97 barrels there is the additional evidence that they were returned in the same state as they went, except that they were coopered.

The case is for the consideration of the jury. They are to weigh it candidly. They are not to be influenced by any considerations of policy, nor by the fact that the revenue may have suffered extensively. The case is to rest upon the evidence. One of the defendants is proved to have been of good character heretofore, and the other is presumed to have been so. If the defendants were allowed to testify, they might explain some facts which are especially applicable to Wright. For this and other reasons the law requires the government to

make out their case to the satisfaction of 12 reasonable men beyond a reasonable doubt.

The charge of Lowell, District Judge, having been concluded, the case was given to the jury, who returned a verdict finding both the defendants, Boyden and Cleaves, guilty.